# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RAYMOND J. BROKENBROUGH, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-692-CJB |
| | ) | |
| CAPITOL CLEANERS & | ) | |
| LAUNDERERS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

Raymond J. Brokenbrough, Dover, DE.

    Plaintiff, *pro se*.

Andrew S. Dupre, MCARTER & ENGLISH, LLP, Wilmington, DE.

    Attorney for Defendant.

## MEMORANDUM OPINION

May 19, 2015
Wilmington, Delaware

*Christopher J. Burke*

**BURKE, United States Magistrate Judge**

Presently pending before the Court is Defendant Capitol Cleaners & Launderers, Inc.'s ("Defendant") Motion for Summary Judgment, filed pursuant to Federal Rule of Civil Procedure 56 ("the Motion"). (D.I. 54) For the reasons set forth below, the Court GRANTS Defendant's Motion.

## I. BACKGROUND

### A. Factual Background

#### 1. The Parties and Plaintiff's Employment

Plaintiff Raymond J. Brokenbrough, Jr. ("Plaintiff"), an African-American man, was employed by Defendant as a route driver from May 4, 2009 until his termination on February 22, 2010. (D.I. 2 at 7; D.I. 42 at 4, 29) When Plaintiff was initially hired, he received $10.00 per hour in wages; after an initial training period, he was assigned to a route ("route #1") and received an 8% commission. (D.I. 42 at 4-5, 15, 36) This compensation arrangement ultimately allowed Plaintiff to earn a total of $500.00 per week before taxes. (*Id.* at 36)

#### 2. Plaintiff's Disciplinary History with Defendant and the Circumstances Leading Up to His Termination

##### a. Plaintiff's Negative Behavior and Written Warnings

During Plaintiff's employment with Defendant, he engaged in a number of documented (and for purposes of the record, undisputed) actions demonstrating negative behavior. (D.I. 55, ex. A at ¶ 9) More specifically, according to a sworn affidavit of E. Stuart Outten, Jr., the sole owner of Defendant, Plaintiff was issued seven formal "Employee Warning Reports" prior to his termination. (*Id.*, ex. A) These warnings were issued in light of, *inter alia*, the following

conduct: (1) in June 2009, Plaintiff "sexually harassed a female co-worker" by making sexually suggestive comments to her; (2) in October 2009, he "forged the signature of a different [Defendant] employee to disguise [Plaintiff's] failure to take payment for delivered goods[,]" (for which he was suspended for a day with no pay); (3) in October 2009, he "stole commission slips from a different employee, and confessed when caught[,]" (for which he received a written warning); (4) in December 2009, Plaintiff crashed his company delivery truck while on an unauthorized trip (for which he was issued a written reprimand, and was demoted to a lesser-paying position); and (5) on various occasions, he arrived late or did not show up at all (i.e., he was a "no call, no show") for work. (*Id.*; *see also id.* at ex. 1) The Employee Warning Reports themselves are included as an exhibit to Mr. Outten's affidavit, and all are signed by Plaintiff. (*Id.* at ex. 1)

b.    **The December 2009 Accident and Its Relationship to Plaintiff's Ability to Work on Route #1 and Route #3**

In his Initial Disclosures, (D.I. 42), Plaintiff provides further detail on one of the incidents described above—the December 2009 delivery truck crash. He acknowledges that he was involved in an automobile accident with a company vehicle in December 2009, an accident in which there were no injuries. (*Id.* at 5, 36) Plaintiff claims that "in retaliation" for that accident, Roger Hearn ("Hearn"), a Service Manager for Defendant, took away Plaintiff's route (route #1), hired a new Caucasian driver to handle the route, and reduced Plaintiff's pay to $10.00 per hour (taking away Plaintiff's 8% commission). (*Id.*) The new driver ultimately declined the route, however, because of the low pay, and that route was thereafter reassigned to Plaintiff. (*Id.*)

Plaintiff also claims that another route ("route #3") became available during his tenure

with Defendant, and that this route paid over $800.00 per week before taxes. (*Id.*) Plaintiff states that he informed Hearn of his interest in the route. (*Id.*) Plaintiff explains that the route "became available to the top 3 senior employees in line of which I was the third"; he states that after the two more senior employees declined the route, Hearn nevertheless neglected to offer him the position. (*Id.* at 5) Instead, he says, Hearn ultimately hired a Caucasian driver with no experience for route #3, and Hearn never explained to Plaintiff why he was not selected instead. (*Id.* at 5, 36)

### c. Plaintiff's Lateness or Absences From Work, His Prostate Cancer and His Termination

As noted above, the record indicates that Plaintiff was late or absent from work on a number of occasions during his employment with Defendant. With regard to this issue, the record indicates the following:

- On an "Attendance Report" dated June 6, 2009, it was noted that Plaintiff reported late for work, and was told that "this can't happen anymore[.]"

- Two "Employee Warning Report[s]" dated November 10, 2009 and November 11, 2009, respectively, note that Plaintiff was a "no call, no show" for work. The latter report notes that there will be "no more tolerance" for this behavior by Defendant.

- On December 26, 2009, Plaintiff received and signed a final written warning that he would be terminated if he had any further unexcused absences.

- On an "Attendance Report" dated January 28, 2010, Plaintiff was listed as being sick and at a doctor's appointment.

- On an "Attendance Report" dated February 1, 2010, Plaintiff was marked as sick, and it was noted that "3 weeks in a row [he] has missed time from work[.]"

4

- On an "Attendance Report" dated February 8, 2010, Plaintiff was marked as late.

- On an "Attendance Report" dated February 18, 2010, Plaintiff was listed as being sick and at a doctor's appointment.

(D.I. 55, ex. A at ¶¶ 12-14 & ex. 1; D.I. 2 at 7)

By at least early 2010, Plaintiff had developed prostate cancer, for which he was scheduled to undergo surgery on February 24, 2010. (D.I. 2 at 7, 10) Defendant was aware of this diagnosis and of the scheduled surgery. (D.I. 42 at 2, 6) In light of Plaintiff's medical condition, Plaintiff's above-referenced lateness/absences on at least February 8 and 18, 2010 were excused by Defendant, who was "trying to give [him] the benefit of the doubt." (D.I. 2 at 7; *see also* D.I. 42 at 5)

Plaintiff scheduled a medical appointment for himself on or about February 22, 2010, but he did not tell Defendant about the appointment in advance, nor ask Defendant for the day off in order to attend the appointment. (D.I. 55, ex. A at ¶ 14)[1] Instead, according to Defendant, Plaintiff called out as "'sick'" at 11:30 p.m. the night before, at a time when none of Defendant's employee's were in the office to take Plaintiff's call. (*Id.*) Plaintiff did not show up for work the next day, and as a result, Defendant was "forced to scramble for delivery coverage of Plaintiff's job." (*Id.*) Plaintiff's absence on February 22 was thus an additional unexcused absence. (*Id.*;

---

[1]     In a number of documents submitted by Plaintiff and Defendant, the date on which Plaintiff did not show up for work is listed as February 22, 2010. (D.I. 2 at 7; D.I. 55, ex. A at ex. 1 at 19-20) In Mr. Outten's affidavit, the date is listed as February 23, 2010. (D.I. 55, ex. A at ¶ 14) Because nearly all of the documents listed in the record put the date at February 22, 2010, and because the discrepancy is immaterial for purposes of the Motion, the Court will hereafter refer to the date as February 22, 2010.

D.I. 2 at 7; *see also* D.I. 55, ex. A at ex. 1 at 19 (noting, in an "Attendance Report" dated February 22, 2010, that Plaintiff was marked as "[s]ick" and that Plaintiff was "calling out 2 much")) Following this additional unexcused absence, and in accordance with the prior warning provided to Plaintiff in December 2009, Defendant terminated Plaintiff's employment on February 22. (D.I. 2 at 7) An "Employee Warning Report" dated the next day, February 23, 2010 confirms the termination; on it, Roger Hearn, the Service Manager, writes: "Due to excessive call outs I am terminating [Plaintiff's] employment at [Defendant]." (D.I. 55, ex. A at ex. 1 at 20)

In his affidavit, Mr. Outten states that Defendant had "repeatedly warned" Plaintiff that arriving late and/or "no-showing" causes Defendant substantial harm in the form of customer disruptions and missed deliveries. (*Id.*, ex. A at ¶ 12) He states that this February 22 "no-show" was Plaintiff's "seventh . . . documented attendance problem[,]" in addition to Plaintiff's other negative employment issues described above. (*Id.* at ¶ 14) Thus, and in light of that employment history, Mr. Outten states that "Plaintiff was terminated because" of the February 22 unexcused absence. (*Id.*; *see also* D.I. 42 at 4, 6) Mr. Outten denies that Plaintiff was terminated based on Plaintiff's race and denies that Defendant ever refused or failed to promote Plaintiff based on race. (D.I. 55, ex. A at ¶¶ 5-7, 10) Mr. Outten indicates that Defendant currently employs nine delivery drivers and that four are African-American. (*Id.* at ¶ 10)

For his part, as to the events of February 22, 2010, Plaintiff states that he was sick, and that he called into work to report this. (D.I. 42 at 5) (Plaintiff asserts that his call came at 6:30 a.m., not at 11:30 p.m. the previous evening, as Defendant contends.). (*Id.*) Plaintiff does not deny that this absence was unexcused. (*Id.*) Instead, in his Initial Disclosures, Plaintiff reports

that his doctor's office did not open until 9:00 a.m. that day, and so he therefore he was unable to provide a doctor's excuse to Defendant prior to missing work. (*Id.*)

In his Initial Disclosures, Plaintiff also makes further reference to his prostate cancer. He asserts that "[s]ince the Plaintiff's diagnosis of prostate cancer, [Mr.] Hearn harassed the Plaintiff, increased the Plaintiff's workload and hours of service until the Plaintiff was terminated from employment on February 22, 201[0]." (*Id.* at 6)

### 3. Plaintiff's Post-Termination Actions

In March 2010, Plaintiff filed a claim with the Delaware Department of Labor's ("DDOL") Division of Unemployment Insurance, asserting that his termination was not for cause. (D.I. 2 at 6; D.I. 55 at 3-4) A hearing officer deemed the termination for cause; later, an appeals officer reversed that decision (thus allowing Plaintiff to collect unemployment benefits), finding that Plaintiff had reasonably assumed Defendant would acquiesce to his February 22, 2010 no-show, since Defendant had done so in the past. (D.I. 2 at 8-9; D.I. 55 at 4) None of the documents in the record regarding the DDOL proceeding reference any form of discrimination or a failure-to-promote claim; instead, they focus solely on Plaintiff's termination and the time frame near to his then-impending prostate surgery.

On May 14, 2010, the United States Equal Employment Opportunity Commission ("EEOC") notified Defendant that Plaintiff had filed a Charge of Discrimination (the "Charge") against it under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.* (D.I. 42 at 17) In the Charge itself, Plaintiff marked boxes indicating that he experienced discrimination based on "Race" and "Disability." (*Id.* at 15) In a section requiring a description of the particulars of the

7

Charge, Plaintiff described: (1) his written reprimand and salary diminution after the December 2009 vehicle accident; (2) Defendant's hiring of a white truck driver, instead of him, to drive route #3 (at a higher salary than Plaintiff was then earning); and (3) his termination two days before his surgery. (*Id.*)

Plaintiff ultimately received a Notice of Right to Sue ("Notice") letter from the EEOC, issued at his request, on January 29, 2013. (D.I. 2 at 2; D.I. 42 at 10) The Notice indicated that the EEOC was terminating its processing of the Charge and that Plaintiff must file his claim under Title VII and/or the ADA in federal or state court within 90 days of his receipt of the Notice. (D.I. 42 at 10)

### B.    Procedural History

On April 14, 2013, Plaintiff, acting *pro se*, filed his Complaint, which (it is not disputed) alleged Title VII racial discrimination claims against Defendant.[2] (D.I. 2 at 3) In the Complaint (a three-page form, titled "Complaint Under Title VII of the Civil Rights Act of 1964[,]"), Plaintiff filled in certain information and checked certain boxes, indicating that the discriminatory acts at issue concerned "[t]ermination of plaintiff's employment" and "[f]ailure to promote plaintiff." (*Id.* at 1-2) The Complaint itself does not make reference to any claim under the ADA, nor to any other claim premised on discrimination based on disability or medical need. (*Id.* at 1-3) Instead, it solely alleges the above-referenced claims of racial discrimination under Title VII. (*Id.*) Attached to the Complaint are documents relating to Plaintiff's DDOL proceeding, which do make reference to Plaintiff's prostate cancer, his illness-related absences in

---

[2]     In Plaintiff's initial Complaint, he named Defendant as "Capitol Uniform & Linen." (D.I. 2) The case caption on the docket was later corrected to note the current name of Defendant: "Capitol Cleaners & Launderers, Inc." (D.I. 11, 21)

February 2010, and his ultimate termination from Defendant's employ. (*Id.* at 6-14)

This case was originally assigned to Chief Judge Leonard P. Stark. The parties thereafter consented to having a United States Magistrate Judge conduct all proceedings in the case, including trial, (D.I. 14), and the Court was designated as the Magistrate Judge assigned to the case for that purpose. After various lengthy delays accompanying Plaintiff's failure to properly serve the Complaint, (D.I. 16, 20), Defendant was ultimately served, and the Court entered a Scheduling Order in May 2014, (D.I. 40).

Thereafter, although Plaintiff filed Initial Disclosures on May 23, 2014, (D.I. 42, 43), and propounded Interrogatories to Defendant on July 18, 2014, (D.I. 46, 52), he failed to respond to Defendant's written discovery requests, (D.I. 48, 49, 50; D.I. 55 at 1; D.I. 59 at ¶ 3), did not appear at his noticed deposition, (D.I. 53; D.I. 55 at 1; D.I. 59 at ¶ 3), and did not notice any depositions or otherwise secure evidence in the record regarding his claims, (D.I. 55 at 1). Fact discovery closed on July 30, 2014. (D.I. 40 at ¶ 3(a))

Defendant filed its Motion on September 29, 2014. (D.I. 54) Plaintiff did not file an answering brief in response to Defendant's Motion.

## II.    STANDARD OF REVIEW

A grant of summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). If the moving party meets this burden, the nonmovant must then "come forward with specific facts showing that there is a *genuine issue for trial*." *Id.* at 587 (emphasis

in original) (internal quotation marks and citation omitted). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). During this process, the Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

However, in order to defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks and citation omitted). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Facts that could alter the outcome are "material," and a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed must support the assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions,

10

interrogatory answers, or other materials"; or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

Where a party has failed to respond to a summary judgment motion, the Court will not simply grant the motion automatically; instead it must evaluate the merits of the motion in order to determine if summary judgment is appropriate. *Anchorage Assocs. v. Virgin Islands Bd. of Tax Review*, 922 F.2d 168, 174-78 (3d Cir. 1990) (vacating a grant of a summary judgment motion premised on the non-movant's failure to respond to the motion, because the lower court did not address the merits); *Bredbenner v. Malloy*, 30 F. Supp. 3d 277, 281 (D. Del. 2014) ("The court will not grant the entry of summary judgment without considering the merits of defendants' unopposed motion.") (citation omitted); *Pennewell v. Grant,* C.A. No. 09-cv-21 (GMS), 2012 WL 394928, at *2 (D. Del. Feb. 7, 2012).

## III.    DISCUSSION

In its Motion, Defendant contends that Plaintiff has not sufficiently advanced a *prima facie* case of racial discrimination under Title VII. (D.I. 55 at 5)  Further, it asserts that the record does not disclose any evidence to rebut its proffered non-discriminatory reasons for the relevant adverse employment decisions at issue, or to suggest that these reasons are a pretext for discrimination.  (*Id.*)  Below, the Court addresses what it determines to be the relevant issues regarding Defendant's Motion.

### A.    Plaintiff's Title VII Racial Discrimination Claims

Title VII provides, in pertinent part, that it shall be an unlawful employment practice for an employer to "discharge any individual, or otherwise to discriminate against any individual

with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. §2000e-2(a)(1). In the absence of direct evidence of discrimination, a plaintiff may prove racial discrimination through the familiar burden-shifting analysis developed by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Hooten v. Greggo and Ferrara Co.*, Civ. No. 10-776-RGA, 2012 WL 4718648, at *3 (D. Del. Oct. 3, 2012).

Under *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case of discrimination by a preponderance of the evidence. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *Mercado v. Donahoe*, 487 F. App'x 15, 17 (3d Cir. 2012). If the plaintiff successfully establishes his *prima facie* case, the burden shifts to the defendant employer to proffer a legitimate, non-discriminatory reason for the adverse employment action. *Reeves*, 530 U.S. at 142; *Hooten*, 2012 WL 4718648, at *3. If defendant employer can provide such a reason, the burden shifts back to plaintiff to demonstrate, by a preponderance of the evidence, that the reasons offered by defendant were not its true reasons for the adverse employment action, but were instead a pretext for discrimination. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999); *Hooten*, 2012 WL 4718648, at *3.

In his Complaint, Plaintiff indicated that he wished to bring two kinds of racial discrimination claims—"[f]ailure to promote" claims, and claims relating to "[t]ermination of [his] employment." (D.I. 2 at 2) Reading Plaintiff's Initial Disclosures liberally, it appears that Plaintiff intends for the former category to include not only Defendant's *failure to promote* him to be the "senior driver of route [#]3" (which would have brought with it an increase in pay, to "$800 a week"), but also Defendant's short-term *demotion* of Plaintiff from driving "route #1"

12

for a month after Plaintiff's auto accident in December 2009. (D.I. 42 at 5) The context of the Plaintiff's "termination" allegations are clearer: they relate to his firing on February 22, 2010. For ease of reference, the Court will (as Defendant has in its brief) refer to these two sets of allegations as the "failure to promote" claims and the "termination" claim.

### 1. "Failure to Promote" Claims

The Court first addresses the failure to promote claims. In order to establish a *prima facie* case of racial discrimination, a plaintiff must meet a four-pronged test. That is, he must show that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered some form of adverse employment action; and (4) this action occurred under circumstances that give rise to an inference of unlawful discrimination. *Hooten*, 2012 WL 4718648, at \*3 (citing *Jones*, 198 F.3d at 410).

Defendant contends that Plaintiff has failed to make out a *prima facie* case as to these claims. Although its briefing could be clearer on this point, Defendant appears to focus solely on the purported absence of evidence as to the fourth prong of the *prima facie* case. (D.I. 55 at 8 (asserting that Plaintiff's allegations here do not state a *prima facie* case, as "Plaintiff is not claiming he was not promoted when otherwise qualified, rather he states he is upset because [Defendant] considers car accidents to be a highly relevant factor in deciding which delivery drivers are better than others."))[3] The Court will thus focus on that prong.

---

[3] It could be that Defendant is also asserting that Plaintiff cannot demonstrate, pursuant to the second prong of the *prima facie* case, that he was "qualified" to drive route #1 or route #3 in the relevant time frames, due to the automobile accident. Considering the facts in the light most favorable to Plaintiff, however, Plaintiff has put forward enough facts to suggest qualification for the positions—that he was employed as a driver by Defendant and (in the case of the route #3 position) that his level of seniority entitled him to be considered for the position. (D.I. 42 at 5, 36) Defendant, for its part, has failed to point to portions of the record indicating

In that regard, since Plaintiff did not meaningfully participate in the discovery process and did not file an answering brief, there is very, very little record evidence regarding his claims of racial discrimination. What there is comes from Plaintiff's Initial Disclosures, and the Court turns there to assess his failure to promote claims. Drawing all reasonable inferences in favor of Plaintiff, the record evidence is as follows:

- In December 2009, Plaintiff was involved in an automobile accident in a company truck, while on an unauthorized trip.

- Shortly thereafter, Defendant demoted Plaintiff from driving route #1, meaning that Plaintiff's pay was reduced (such that instead of making an 8% commission, Plaintiff received only a $10.00 hourly rate).

- Defendant hired a Caucasian driver to handle the route instead of Plaintiff. Shortly thereafter, this driver declined the route, due to low pay. Plaintiff then returned to the route within one month of his demotion.

- Sometime thereafter, an opening became available to drive route #3 (which involved an increase in pay from Plaintiff's position on route #1). After the top two senior employees declined the route, Plaintiff was the next most senior employee in line to be offered the job.

- Plaintiff expressed interest in route #3 to Mr. Hearn, but was

---

what the qualifications were for either of the route #1 or route #3 positions, or to statements by Defendant (including from Mr. Outten) indicating that Plaintiff's accident/disciplinary status in fact rendered him "unqualified" for the positions. *See Seibel v. Marketplace Direct, Inc.*, No. 2:05CV684, 2007 WL 788384, at *2 (W.D. Pa. Mar. 13, 2007) (noting that the defendant did not point to evidence indicating that a plaintiff was unqualified for the employment position at issue, regarding the second prong of the *prima facie* case, where the defendant's complaints referred to plaintiff's job performance and not his qualifications for the position at issue); *cf. Clark v. PNC Fin. Servs. Grp.*, No. 2:10-cv-00378, 2011 WL 5523631, at *6 & n.3 (W.D. Pa. Nov. 14, 2011) (noting that while the second prong of the *prima facie* case focuses on the fitness of the employee to hold a position, the fourth prong considers the workplace performance of the employee, and whether any such action on the part of the employer in response gives rise to an inference of actionable discrimination).

14

> not given the position. Instead, Mr. Hearn hired a Caucasian
> driver for the route who had no experience.

(D.I. 42 at 5, 36; D.I. 55, ex. A at ¶ 9)

In light of the above, it appears that the sole evidence to which Plaintiff could point—in order to raise an inference that the demotion from route #1 or the failure to promote him to route #3 was due to racial discrimination—is that a newly-hired white employee was selected instead of Plaintiff to drive these two routes. However, courts have held that such evidence is sufficient to satisfy the fourth prong of the *prima facie* case. *See Harry v. City of Phila.*, No. Civ.A. 03-661, 2004 WL 1387319, at *5 (E.D. Pa. June 18, 2004) (stating that a plaintiff can satisfy the fourth prong by pointing to evidence indicating "the hiring of someone not in the protected class as a replacement[.]"); *see also Johnson v. Keebler-Sunshine Biscuits, Inc.*, 214 F. App'x 239, 242 (3d Cir. 2007); *Casas v. Bank of Am., N.A.*, Civil Action No. 09-6133, 2011 WL 3837071, at *4 (E.D. Pa. Aug. 30, 2011); *Bullock v. Children's Hosp. of Phila.*, 71 F. Supp. 2d 482, 487 (E.D. Pa. 1999). The Court finds that Plaintiff has overcome the fourth prong's hurdle for purposes of the motion.

Even so, Defendant has clearly met its "relatively light burden" to thereafter articulate a "legitimate, nondiscriminatory reason for the employee's rejection." *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir. 1994) (internal quotation marks and citation omitted). This burden is satisfied when the evidence, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the employment decision. *Id.* (citation omitted). Here, Defendant's brief cites such a reason: Plaintiff's December 2009 crash of Defendant's delivery truck—an accident that came after Plaintiff had already been disciplined for numerous other inappropriate actions (including

making sexually suggestive comments to a co-worker, forging work-related documents, taking commissions from a co-worker without authorization, and "constantly no-call-no-show[ing]" at work). (D.I. 55 at 8-9)  In his sworn affidavit, in explaining why Defendant "refuse[d] and/or fail[ed] to promote" Plaintiff, Mr. Outten points to this same reason as well.  (D.I. 55, ex. 1 at ¶¶ 7-9); *see also Fuentes,* 32 F.3d at 765-66 (concluding that, *inter alia,* plaintiff's habitual lateness to work and general unprofessional conduct amounted to legitimate non-discriminatory reasons for failing to hire plaintiff); *Jacques-Scott v. Sears Holding Corp.,* C.A. No. 10-422-LPS/MPT, 2013 WL 2897427 at *8 (D. Del. June 13, 2013) (same, as to plaintiff's uncooperative behavior and submission of fraudulent paperwork).

If a defendant meets its burden, then the burden shifts back to the plaintiff to show that the employer's reasoning was pretextual. *Fuentes,* 32 F.3d at 763-64.  To defeat summary judgment, the Plaintiff must point to some evidence, direct or circumstantial, from "which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes,* 32 F.3d at 764.

Here, Plaintiff has failed to point to such evidence.  Not only has he failed to respond substantively to Defendant's Motion, but he has otherwise failed to put into the record any evidence (beyond his own conclusory assertions of discrimination) that might raise sufficient doubt in this regard. *See Kimble v. Morgan Props.,* 241 F. App'x 895, 898 (3d Cir. 2007) (affirming the district court's grant of summary judgment where a plaintiff "introduced no evidence that the circumstances[] surrounding [defendant's] decision not to promote and to terminate him[] could give rise to pretext or an inference of discrimination"); *Roane v. Delaware*

*Transit Corp.*, Civ. No. 12-231-LPS, 2015 WL 1228627, at *3-4 (D. Del. Mar. 17, 2015) (granting summary judgment where plaintiff failed to oppose the summary judgment motion, and where "nothing before the Court . . . contradict[ed] the proffered reason" for the adverse employment action); *Jacques-Scott,* 2013 WL 2897427 at *8 (granting summary judgment as to a discrimination claim where plaintiff "does not refute that her terminat[ion] was for any other reason than those proffered by defendants"). In light of this lack of evidence, and the significant disciplinary history that Plaintiff had amassed immediately preceding Defendant's decisions as to route #1 and route #3, no reasonable jury could find that Plaintiff had sufficiently demonstrated pretext. Summary judgment as to these claims is therefore warranted.

### 2. Plaintiff's Termination

With regard to Plaintiff's claim of racial discrimination as to his termination, Defendant again primarily focuses on the purported absence of evidence as to the fourth prong of the *prima facie* case. (D.I. 55 at 7 ("Plaintiff entirely failed to even allege (let alone proffer evidence of) any fact that might have given rise to a rebuttable inference that Plaintiff was terminated for some racially-discriminatory reason.")) Here, the Court agrees with Defendant that no such evidence exists in the record.

In the few materials Plaintiff made part of the record regarding his termination (i.e., the Complaint and its attachments, and Plaintiff's Initial Disclosures), Plaintiff makes no clear allegation that his termination occurred under circumstances giving rise to an inference of unlawful racial discrimination, and he points to no evidence suggesting the same. Even viewed in the light most favorable to Plaintiff, what evidence there is indicates that Plaintiff was terminated because: (1) he did not appear for work on February 22, 2010 due to a medical

appointment relating to his prostate cancer; and (2) he did not get this absence excused in advance. (D.I. 2 at 7; D.I. 42 at 4-5; D.I. 55, ex. A at ¶ 14)  Plaintiff has not made out a *prima facie* case of racial discrimination.

Even were this conclusion somehow incorrect, Defendant clearly put forward a legitimate, non-discriminatory reason for Plaintiff's firing:  Plaintiff's unexcused absence on February 22, coming after a warning that any further unexcused absences would result in termination. (D.I. 55, ex. A at ¶¶ 13-14)  And Plaintiff has done nothing to rebut that explanation, nor to suggest it is a pretext for racial discrimination. *See Roane*, 2015 WL 1228627 at *3-4.

For these reasons, summary judgment as to Plaintiff's claim of racial discrimination regarding his termination is also warranted.

## B.    Scope of Plaintiff's Complaint

Before concluding, the Court confronts one additional question—one not raised by Defendant's opening brief—regarding the scope of this case.  The scope issue is relevant here because, with Plaintiff's racial discrimination claims now subject to summary judgment, were there no other claims at issue in the case, the Court's accompanying Order would normally require that the case be closed and judgment be entered for Defendant.

Before taking that step, the court notes that it could be argued that, based on the contents of certain portions of the case record, Plaintiff intended to bring (or believes he has brought) a claim in this case pursuant to the ADA.[4]  As noted above, in Plaintiff's EEOC Charge, he listed

---

[4]    Defendant, for its part, assumes in its opening brief that only racial discrimination claims are at issue in the case.  (D.I. 55)  It clearly expects that if its Motion is granted in full, then the case will be closed.

not only a claim of racial discrimination based on Title VII, but also a claim of disability discrimination under the ADA. (D.I. 42 at 15-18); *see also Fox v. MBNA Am. Bank*, N.A., No. Civ. 06-488 SLR, 2006 WL 2711835, at \*2 (D. Del. Sept. 20, 2006) (noting that both Title VII and the ADA require that, in order to bring a claim in federal court under either Act, a plaintiff must first have exhausted his administrative remedies by filing charges with the EEOC as to those claims, and have received a notice of the right to sue letter from the EEOC) (citing cases). And in his Initial Disclosures—the only other document in the record, other than the Complaint, that provides even a hint as to what Plaintiff intends to assert here—Plaintiff does make frequent reference to his prostate cancer and to his scheduled surgery on February 24, 2010, while also including a section relating to the concept of "[d]isabilities [e]mployment [p]rotections[.]" (D.I. 42 at 5-6) In that section, Plaintiff writes "[s]ince the Plaintiff's diagnosis of prostate cancer, [Defendant's manager] Roger Hearn harassed the Plaintiff, increased the Plaintiff's workload and hours of service until the Plaintiff was terminated from employment on February 22, 201[0]." (D.I. 42 at 2, 6)

A *pro se* complaint must be read liberally, and the applicable law is applied "irrespective of whether a pro se litigant has mentioned it by name." *Holley v. Dep't of Veteran Affairs*, 165 F.3d 244, 247-48 (3d Cir. 1999). However, even *pro se* plaintiffs are still subject to the Federal Rules. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California*, 422 U.S. 806, 834 n.46 (1975) (stating that *pro se* parties must still "comply with relevant rules of procedural and substantive law"); *Thompson v. Target Stores*, 501 F. Supp. 2d 601, 603-04 (D. Del. 2007) ("The Third

Circuit has consistently abided by the Supreme Court's guidance on this matter, dismissing *pro se* complaints when the plaintiff has failed to abide by the Federal Rules.").

In the end, even construing Plaintiff's Complaint liberally, the Court cannot conclude that the Complaint asserted anything other than Title VII claims of racial discrimination. There is no reference in the three-page Complaint itself to any cause of action other than the Title VII claims. No facts are pleaded in the Complaint in an attempt to set out the elements of an ADA claim.[5] The Complaint includes several attachments (though notably, the Charge itself is not attached). But even if the facts in these attachments are considered,[6] Plaintiff still fails to set forth such a claim. The first attachment, the EEOC right-to-sue letter, includes no facts regarding any *specific* ADA claim by Plaintiff (although it includes form language regarding ADA claims generally). (D.I. 2 at 4-5) Plaintiff then attaches a "Referee's Decision" from the Division of Unemployment Insurance Appeals, which states that Defendant was aware of his prostate cancer, but does not reference any allegation of discrimination on the basis of that condition. (*Id.* at 6-9) Finally, Plaintiff attaches his "Procedure/Surgical Instructions" relating to his surgery, as well as Family and Medical Leave Act paperwork for his planned absence—neither of which contain

---

[5]     In order to state a claim under the ADA, a party must plead facts establishing that he or she: "(1) has a disability; (2) is a qualified individual; and (3) has suffered an adverse employment decision because of that disability." *Lorah v. Tetra Tech Inc.*, 541 F. Supp. 2d 629, 635 (D. Del. 2008) (internal quotation marks omitted) (citing *Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 511-12 (3d Cir. 2001)).

[6]     *See Lewis v. Attorney Gen. of U.S.*, 878 F.2d 714, 722 n.20 (3d Cir. 1989) ("'The federal rules do not adhere to the ancient principle that a pleading must be construed most strongly against the pleader. . . . This is particularly true when a court is dealing with a complaint drawn by a layman unskilled in the law. In these cases, technical deficiencies in the complaint will be treated leniently and the entire pleading will be scrutinized to determine if any legally cognizable claim can be found within it.'") (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1286 (1969)).

facts sufficient to set forth a claim under the ADA. (*Id.* at 10-14) In the end, at no point in his Complaint or the attached documents does Plaintiff point to any adverse action (such as termination) that is asserted to have occurred as a result of *discrimination based on a disability.*[7] *Cf. Zankel v. Temple Univ.*, 245 F. App'x 196, 199 (3d Cir. 2007) (affirming dismissal of ADA claim where plaintiff failed to show that she was terminated as a result of discrimination); *Shahin v. Delaware Dep't of Fin.*, Civ. Action No. 10-188-GMS, 2011 WL 2470582, at *3-4 (D. Del. June 21, 2011) (dismissing claims without prejudice where Plaintiff's form complaint referred to her EEOC charge, but Plaintiff failed to attach an EEOC charge to the complaint, and failed to set forth the elements of her discrimination claim); *Dixon v. Elizabeth Bd. of Educ.*, No. Civ. No. 08-4243(DRD), 2010 WL 1742214, at *4 (D.N.J. Apr. 27, 2010) ("In the spirit of construing *pro se* complaints liberally, the Court searched [plaintiff's] Amended Complaint and was unable to find any corresponding allegation [of retaliation]. [Plaintiff] did not even incorporate [the EEOC charge or letter] by referencing or attaching either to the Amended Complaint.").

Thus, Plaintiff's claims of racial discrimination are the only claims at issue in the case. Those claims being subject to summary judgment, judgment in favor of Defendant shall be entered and the case closed.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's Motion.[8]  An appropriate

---

[7]      The Court recognizes that cancer can be a disability under the ADA. *Showers v. Endoscopy Ctr. of Cent. Pennsylvania, LLC*, Civil Action No. 1:13-CV-1146, 2014 WL 5810313, at *10 (M.D. Pa. Nov. 7, 2014).

[8]      In light of the Court's decision, the Court DENIES as MOOT the unresolved portion of Defendant's Motion to Withdraw Scheduling Order and for Rule to Show Cause, (D.I. 59), in which Defendant moves the Court to enter a Rule to Show Cause why this action should

Order follows.

---

not be dismissed for Plaintiff's failure to prosecute, (*id.* at ¶ 6). It also DENIES Plaintiff's March 8, 2015 filing, styled as a "Motion to Reschedule the Scheduling Order[/]Pretrial Hearing" and "Motion to Dismiss Summary Judgment." (D.I. 63) This filing contained no substantive argument as to why the pending Motion should be denied, (D.I. 63 at 2), and, as noted above, was filed months after the deadline for Plaintiff to submit an answering brief as to the Motion.